517 So.2d 886 (1987)
Jerry Wayne BECKHAM, Plaintiff-Appellee,
v.
COMMERCIAL UNION INSURANCE COMPANY, et al., Defendants-Appellants.
No. 86-838.
Court of Appeal of Louisiana, Third Circuit.
October 7, 1987.
Mixon & Lee, James T. Lee, Bunkie, for plaintiff-appellee.
Guglielmo, Lopez & Tuttle, H. Douglas Hunter, Opelousas, for defendants-appellants.
Before DOMENGEAUX, GUIDRY and DOUCET, JJ.
GUIDRY, Judge.
This is an appeal in a worker's compensation case. Defendants, Century Telephone Enterprises, Inc. (Century), and Commercial Union Insurance Company (Commercial Union), appeal the trial court's award of compensation benefits to plaintiff, Jerry Wayne Beckham. Beckham answered the appeal, contending that the trial court erred in awarding him supplemental earnings benefits as opposed to total and permanent disability benefits. Beckham also asserts error in the trial court's failure to award him penalties and attorney's fees.

FACTS
On June 4, 1984, Beckham was employed by Century as a telephone installer/repairman. *887 At the time of the accident, Beckham had climbed a telephone pole to secure a cable when he leaned forward and suddenly experienced a "popping" sensation in his lower back, accompanied by a "burning hurting pain". Beckham climbed partway down the pole and then blacked out, falling approximately fifteen feet to the ground. An ambulance was summoned and he was taken to Marksville General Hospital where he was treated conservatively by Dr. Richard Michel. Because of the continued pain in Beckham's lower back and legs, Dr. Michel referred him to Dr. John T. Weiss, an orthopaedic surgeon in Alexandria. Dr. Weiss examined Beckham on June 14, 1984, and found some decreased sensation of the L-5 dermatome and to a lesser degree the S-1 dermatome on the right. Beckham was thereafter admitted to Rapides General Hospital for x-rays. Dr. Weiss diagnosed a bulging disc at L4-5. On June 24, 1984, Dr. Weiss administered a chymopapain injection[1] to Beckham, in an effort to dissolve the bulge so that it would not impinge the nerve root. Beckham remained hospitalized for four days in connection with this treatment. Beckham continued to suffer considerable pain in his back, right leg and knee following the injection. On October 24, 1984, a CAT scan was performed, with the result suggesting the need for surgical intervention. Thereafter, Dr. Weiss performed a laminectomy on November 2, 1984.
After one month of convalescence, Dr. Weiss released Beckham to light duty work, with the restrictions that he refrain from a significant amount of bending or climbing or lifting objects weighing over thirty pounds. As of January 3, 1985, Dr. Weiss was of the opinion that Beckham had suffered a 15% permanent impairment and loss of physical function to the body as a whole. Beckham was discharged from Dr. Weiss' care on January 15, 1985. Dr. Weiss was of the opinion that the laminectomy had produced good results.
On July 22, 1985, with the aid of a vocational rehabilitation consultant, Charlotte Huddleston, Beckham secured a job with the Louisiana State Penitentiary at Angola as a dormitory correctional officer. Prior to his hiring, Beckham was required to undergo a complete physical examination. Beckham testified at trial that, at the time that he took the job at Angola, he was still suffering with pain and numbness in his right leg, which became worse upon exertion. Beckham commuted to Angola from his home in Hamburg, a drive of approximately 45 to 60 minutes. His job duties at Angola included the supervision of inmates and the dormitory itself, hourly head counts of the prisoners, written reports and some amount of walking.
On October 14, 1985, Beckham had to leave work early because of an onset of pain in his lower back and numbness in his right leg from the knee down. He was examined by Dr. Weiss on October 16, 1985, who diagnosed Beckham's condition as a mild irritation of the sciatic nerve or the L-5 nerve root. Dr. Weiss prescribed pain medication and a muscle relaxant for Beckham. Beckham returned to Dr. Weiss' office on October 23, 1985, for a CAT scan. The scan was negative except for indications of some mild arthritic changes in Beckham's back. There was no evidence of a herniated disc nor any significant evidence of scarring around the disc. Dr. Weiss recommended that Beckham stay off work and decrease his activity for the following two weeks. On October 28, 1985, Beckham resigned from his position at Angola and has never returned to work there.
Dr. Weiss examined Beckham again on November 6, 1985. At that time, Dr. Weiss observed that Beckham was doing much better, with only mild back soreness. The neurological exam of Beckham's lower extremities produced "perfectly normal" results. With regard to Beckham's resignation from his employment at Angola, Dr. Weiss stated in deposition:
"... And I suspect this was good, although he apparently in the past had not *888 had altercations but I was concerned previously about the fact that if he did have altercations with the inmates it could be something quite severe in regard to a fight or suppression of activities of an inmate. And I was much happier that he had resigned it, and I recommended some type of rehabilitation program...."
Beckham testified that he terminated his employment at Angola because he was experiencing pain in his lower back and leg and numbness in the inside of his right leg from the knee down. At trial, Beckham stated that this problem had not resolved itself since he left Angola in October, 1985. He testified further that he has very little feeling in his inner right leg from the knee down, and that he has "not really" felt physically able to perform any type of employment. Beckham stated that he can no longer do household chores such as cutting the grass or gardening but he is able to fish a little. Although Beckham urges that the back pain has persisted, he had not returned to see Dr. Weiss, or any other physician, since November 6, 1985. Beckham did concede at trial that he would be willing to try his hand at some type of sales position if he could do so without hurting himself. In her testimony, Beckham's wife, Debra, substantiated his continued complaints of pain.
Beckham filed the instant suit on January 24, 1986, seeking total and permanent disability benefits plus penalties and attorney's fees. On the day of trial, the following facts were stipulated to by the parties:
1. Beckham sustained a work-related injury while employed with Century on June 4, 1984.
2. At the time of his injury, Beckham was earning $8.92 per hour.
3. Commercial Union was Century's worker's compensation carrier at the time of the accident.
4. Beckham was paid worker's compensation benefits for a period of 59 weeks at a rate of $237.88 per week.
5. On July 21, 1985, weekly compensation benefits paid to Beckham were terminated as a result of his employment at Louisiana State Penitentiary, and monthly supplemental earnings benefits were commenced.
6. Beckham made $1,072.00 per month in his employment at Louisiana State Penitentiary.
7. On October 28, 1985, Beckham voluntarily terminated his employment and had not returned to gainful employment as of the time of trial.
8. Commercial Union paid supplemental earnings benefits to Beckham, commencing July 21, 1985, as follows:[2]

August, 1985 $264.51
September, 1985 239.61
October, 1985 67.41
November, 1985 252.06
December, 1985 252.06
January, 1986 252.06
February, 1986 252.06
March, 1986 252.06

On June 10, 1986, the trial court rendered and signed a judgment providing as follows:
"ORDERED, ADJUDGED AND DECREED, that there be judgment herein in favor of the Plaintiff, JERRY WAYNE BECKHAM, and against the Defendants, CENTURY TELEPHONE ENTERPRISES, INC., and COMMERCIAL UNION INSURANCE COMPANY, in solido, from July 21, 1985 in the amount of $595.38 per month or seventy-four percent of the difference between $1,380.78 and any amount actually earned in a month, whichever is the lesser amount, during the period of disability but not beyond a maximum of 461 weeks (520 weeks less 59 weeks for which full benefits were paid) subject to a credit for all supplemental earnings benefits paid since July 21, 1985 and subject to all of the provisions of Revised Statutes 23:1221(3)(b) through 23:1221(3)(f); further, for all reasonable medical expenses incurred in the care and treatment of the injuries received in the course of his employment *889 for Century Telephone Enterprises, Inc."[3]
Plaintiff's claim for penalties and attorney's fees was denied.
On appeal, defendants-appellants urge that:
1. The trial court erred in finding that plaintiff was disabled from performing the duties of a prison security guard.
2. The trial court erred in using the federal minimum wage in computing the allowable supplemental earnings benefits due plaintiff.
Plaintiff answered the appeal, urging that the trial court erred in failing to award him total and permanent disability benefits and also in failing to award penalties and attorney's fees.

PERMANENT TOTAL DISABILITY VS. SUPPLEMENTAL EARNINGS BENEFITS
La.R.S. 23:1221, as amended by Acts 1983, 1st Ex.Sess., No. 1, § 1, effective July 1, 1983, governs the determination of whether an injured employee is entitled to permanent total disability or supplemental earnings benefits. The 1983 amendment established a stricter standard for establishing permanent and total disability, i.e., the claimant must prove, by clear and convincing evidence, that he is physically unable to engage in any employment or self-employment, regardless of the nature of the employment or self-employment, including "any and all odd-lot employment, sheltered employment, or employment while working in any pain, notwithstanding the location or availability of any such employment or self-employment". La.R.S. 23:1221(2)(a), (b), (c).
In concluding that Beckham had not carried this burden, the learned trial judge stated:
"There is considerable controversy about Dr. Weiss' opinion relating to plaintiff working as a security guard at Angola. Counsel for plaintiff argues that Weiss said plaintiff could not, or should not, work as a security guard and defendants' counsel argues that Weiss said he could perform those duties. There is some basis for both positions and Dr. Weiss' actual testimony on this point should be recited:
`Well, I advised him again regarding activities, and the patient stated he had resigned from his Angola guard position. And I suspect this was good, although he apparently in the past had not had altercations but I was concerned previously about the fact that if he did have altercations with the inmates it could be something quite severe in regard to a fight or suppression of activities of an inmate. And I was much happier that he had resigned it, and I recommended some type of rehabilitation program.' (Depo. page 29)
* * * * * *
`Q. Okay. But that was your concern as far as him returning to Angola? Was a possible confrontation with some guards and thus a re-injury?
A. Correct.
Q. With the work as you know as an Angola guard, would you have any problems with that work absent the possibility of an altercation?
A. I wouldn't think so.
Q. That would be within your framework of light duty work then?
A. Correct.' (Depo. pps. 31-32)
In connection with the above testimony, Dr. Weiss' summation on the issue of returning to work should be considered:

*890 `Q. It would be your recommendation that he not return to performing heavy manual labor?
A. That's correct.
Q. And would it alsowould you have an opinion as to whether or not if he returned to doing sedentary type work that he would be performing those duties as of the last time that you saw him completely pain free?
A. I don't think I could completely say that. My impression is thatof how he would feel is that occasionally he may get a little catchy back discomfort and indeed I'm not so sure that a patient that is that way is better off than one that has absolutely no discomfort, since it will tell them like a little warning device to be careful with their back. I think that basically overall he's quite comfortable and can do most activities ofwhat will we say normal daily living that anyone else can do without any discomfort, but occasionally he may do a twisting motion and get a little catchy discomfort in his back. And that's what I would normally expect would be the usual.'
(Depo. pps. 42-43)
A determination of what employment is reasonably available to plaintiff is not simple. The testimony of Charlotte Huddleston, a rehabilitation consultant, is not much help because it consists of simply a report on light work jobs which may be available in the general area of plaintiff's home. There are many factors which would affect her testimony which cannot be explored in detail, such as the potential employers' physical examination requirements; transportation costs to get to work vis-a-vis total pay; the number of potential applicants for the available jobs; and the comparative physical condition of the other applicants. This court would summarize Ms. Huddleston's testimony as simply being that there is a reasonably good chance for someone with plaintiff's condition to find light duty work.
The employment as a security guard at Angola must be addressed specifically. By its very title, `security guard', the job suggests that the worker must be able to control and/or restrain prisoners. While it is true that physical confrontation is not a day to day occurrence for most security guards, it would be naive to think that such would be totally unexpected. While it is true that Dr. Weiss testified that this work would be `within the framework of light duty', this response must be read with the question which it answered, and that question was conditioned with the words `absent the possibility of an altercation'. It is the finding of the court that plaintiff is not physically able to safely and reasonably perform the duties of a prison security guard.
In considering plaintiff's ability to perform other jobs, his qualifications must be carefully considered. The plaintiff has a high school education and his only work experience other than as a telephone installer-repairman has been as a mechanic's helper, a carpenter's helper, and as a stock clerk in a store. Dr. Weiss' recommendation that plaintiff not lift anything exceeding 20-30 pounds must also be considered in connection with plaintiff's qualifications.
On the positive side, the plaintiff makes a very neat and intelligent appearance. He answered questions well and appeared to be very honest and straightforward. It should also be pointed out that the plaintiff showed good faith in attempting the security guard job as it certainly showed a willingness to return to work."
After a rather lengthy and unnecessary discussion of plaintiff's possible rights under the now defunct "odd-lot" doctrine, the trial judge concluded as follows:
"The court holds that plaintiff is disabled from performing the duties of a telephone installer-repairman which he was performing at the time of his injury; further, as discussed in detail above, he is also disabled from performing the duties of a prison security guard; further, that as of the time he returned to work on July 21, 1985, he was in fact disabled from reasonably performing the job of a *891 prison security guard but he was capable of performing numerous other jobs which were reasonably available in the area; further, that he was capable at that time and is presently capable of earning the Federal minimum wage of $3.35 per hour."
The manifest error rule is applicable to a review of worker's compensation cases and the trial court's findings will not be disturbed where there is evidence before the trier of fact which, upon the latter's reasonable evaluation of credibility, furnishes a reasonable, factual basis for those findings. Guerrero v. Tico, 436 So.2d 1237 (La.App. 5th Cir.1983); Perrilloux v. Godchaux-Henderson Sugar Co., Inc., 436 So. 2d 1325 (La.App. 5th Cir.1983), writ denied, 440 So.2d 760 (La.1983).
Considering the stringent standards which now apply to an award of total and permanent disability benefits, we conclude that the trial judge did not err in refusing to award such to plaintiff. Plaintiff failed to carry his burden of proving, by clear and convincing evidence, that he was totally and permanently disabled as defined in La. R.S. 23:1221. Dr. Weiss, the sole medical expert to testify, opined that Beckham was capable of performing various jobs classified as "light duty work" with certain restrictions. Beckham himself expressed a willingness to pursue a sales job, so long as it did not entail any degree of manual labor or physical exertion.
We also find no clear error in the trial court's finding that Beckham was incapable of returning to his duties as a security guard at Angola. Although such job can be classified as "light duty" employment, the foreseeable chance of Beckham encountering a physical confrontation with a prison inmate removes it from the realm of employment possibilities. The trial court's decisions in these areas are without error.

FEDERAL MINIMUM WAGE
Defendants' next argument on appeal is that the trial court erred in using the federal minimum wage of $3.35 per hour in computing the supplemental earnings benefits due plaintiff.
La.R.S. 23:1221(3),[4] as amended by Acts 1983, 1st Ex Sess, No. 1, § 1, sets forth the basis for an injured employee's entitlement to supplemental earnings benefits as follows:
"(a) For injury resulting in the employee's inability to earn wages equal to ninety per cent or more of wages at time of injury, supplemental earnings benefits equal to seventy-four percent of the difference between ninety percent of the average monthly wages at time of injury and average monthly wages earned or average monthly wages the employee is able to earn in any month thereafter in any employment or self-employment, whether or not the same or a similar occupation as that in which the employee was customarily engaged when injured and whether or not an occupation for which the employee at the time of the injury was particularly fitted by reason of education, training, and experience, such comparison to be made on a monthly basis. Average monthly wages shall be computed as four and three-tenths times the wages as defined in R.S. 23:1021(10).
(b) For purposes of Subparagraph (3)(a), of this Paragraph, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sums actually received by the employee, including, but not limited to, earnings from odd-lot employment, sheltered employment, and employment while working in any pain.
(c)(i) Notwithstanding the provisions of Subparagraph (b) of this Paragraph, for purposes of Subparagraph (a) of this Paragraph, if the employee is not engaged in any employment or self-employment, as described in Subparagraph (b) *892 of this Paragraph, or is earning wages less than the employee is able to earn, the amount determined to be the wages the employee is able to earn in any month shall in no case be less than the sum the employee would have earned in any employment or self-employment, as described in Subparagraph (b) of this Paragraph, which he was physically able to perform, and (1) which he was offered or tendered by the employer or any other employer, or (2) which is proven available to the employee in the employee's or employer's community or reasonable geographic region."
Defendant argues on appeal that plaintiff's supplemental earnings benefits should be calculated in accordance with the salary which plaintiff was making while employed at Louisiana State Penitentiary, i.e., $1,072.00 per month. We disagree. Beckham was physically unable to return to his former employment at Angola and was unemployed at the time of trial. Therefore, his supplemental earnings benefits should be calculated in terms of the wage plaintiff would have earned from employment proven available to plaintiff in his or his employer's community or reasonable geographic region. In the instant case, vocational rehabilitation expert, Charlotte Huddleston, presented evidence of several employment opportunities available to Beckham in the immediate area taking into account Beckham's physical limitations as set forth by Dr. Weiss. The available jobs enumerated by Huddleston included various sales positions, a security guard position at a local hotel, cashier positions, an assistant manager position at a fast food restaurant, a motel desk clerk job, a customer service representative position and a position as an air traffic controller. The salaries for these various jobs ranged from a minimum wage of $3.35 per hour to $6.50 per hour, with the air traffic controller position starting at an annual salary of $17,824.00. The majority of the available jobs identified by Huddleston were at or just above the federal minimum wage of $3.35 per hour.
Defendants argue in the alternative that the trial court should have based its calculations of supplemental earnings benefits on the $17,824.00 yearly salary of the air traffic controller position, as this position was proven by defendant to be "available" to Beckham. In our view, the evidence falls short of proving that an air traffic controller job was available to plaintiff. The record reflects only that such a position was open in the area and that plaintiff could have applied therefor and if he passed the qualifying test and was otherwise qualified, he would have been considered for training in that field after which he would receive a starting salary of $17,824.00. Under these circumstances, it can hardly be said that the air traffic controller job was proven available to plaintiff. In sum, we find no clear error in the trial court's determination that employment at the federal minimum wage level was proven available to plaintiff.

PENALTIES AND ATTORNEY'S FEES
The final issue on appeal is whether the trial court erred in denying plaintiff's claim for penalties and attorney's fees.
Under the 1983 amendments to the worker's compensation statutes, the arbitrary and capricious standard is no longer applicable to the assessment of penalties. La.R. S. 23:1201(C) and (E) set forth the requisites in assessing penalties as follows:
"C. Installment benefits payable pursuant to R.S. 23:1221(3) shall become due on the fourteenth day after the employer or insurer has knowledge of the compensable supplemental earnings benefits on which date all such compensation then due shall be paid.
....
E. If any installment of compensation payable without an order is not paid within the time period provided in Subsections (B), (C), or (D) of this Section, there shall be added to such unpaid installment a penalty of an amount equal to twelve percent thereof, which shall be paid at the same time as, and in addition to, such installment of compensation, unless such nonpayment results from conditions over which the employer or insurer *893 had no control. Whenever the employee's right to such benefits has been reasonably controverted by the employer or his insurer, the penalties set forth in this Subsection shall not apply. The twelve percent additional payment shall be assessed against either the employer or the insurer, depending upon who was at fault in causing the delay. No worker's compensation insurance policy shall provide that this sum shall be paid by the insurer if the director or the court determines that the twelve percent additional payment is to be made by the employer rather than the insurer. Any additional installment of compensation paid by the employer or insurer pursuant to this Section shall be paid directly to the employee."
The 1983 revision of La. R.S. 23:1201.2 provides for the award of attorney's fees, in pertinent part, as follows:
"Any insurer liable for claims arising under this Chapter, and any employer whose liability for claims arising under this Chapter is not covered by insurance, shall pay the amount of any claim due under this Chapter within sixty days after receipt of written notice. Failure to make such payment within sixty days after receipt of notice, when such failure is found to be arbitrary, capricious, or without probable cause, shall subject employer or insurer, in addition to the amount of the claim due, to payment of all reasonable attorney's fees for the prosecution and collection of such claim,..."
In denying plaintiff's claim for penalties and attorney's fees, the trial judge stated:
"Plaintiff's claim for penalties and attorney's fees is based upon several factors. Plaintiff asserts that he was unable to continue the work at Angola because of his condition and that the defendant insurer should have resumed full weekly benefits. Additionally, that even if plaintiff was entitled to only supplemental earnings benefits, that the insurer was arbitrary and capricious by failing to pay the proper amounts for the months of October through December, 1985 and by being unduly tardy with the payments for January through March of 1986.
....
... [T]he court finds that the defendant insurer was not arbitrary or capricious in continuing to pay supplemental earnings benefits when plaintiff terminated his employment as a security guard. Although Dr. Weiss approved of plaintiff's decision to quit because of the potential for re-injury, he did not state that the plaintiff was unable to perform the work and he had previously cleared him for the job. With respect to the amount of supplemental benefits due and tardiness of some of the payments, the record indicates that although the insurer could have been more prompt, there were questions about the actual amount due and this confusion was not entirely the fault of the insurer.
Even though this court has held that plaintiff is disabled from performing the work of a security guard, there was nevertheless a legitimate dispute on the issue and there was no medical report indicating that he could not do such work. Penalties and attorney's fees may be assessed only when the facts clearly show arbitrary and capricious nonpayment. The statute authorizing penalties and attorney's fees is stricti juris. Fazande v. New Orleans Public Service, Inc., 430 So.2d 225 (1983); Conner v. Travelers Insurance Company 324 So. 2d 903 (1975); Levine v. Mutual Insurance Insurance Company 305 So.2d 665 (1974); Guidry v. Sline Industrial Painters, Inc. 418 So.2d 626 (1982).
The court finds that the insurer's handling of the payment of benefits, although less than ideal, was not arbitrary or capricious within the terms of the worker's compensation law. Accordingly, plaintiff's claim for penalties and attorney's fees is denied."
We agree with the trial court that, under the circumstances, the defendant was not arbitrary or capricious in the handling of this matter. There was a reasonable dispute as to Beckham's entitlement to supplemental earnings benefits and/or the amount thereof. We therefore find no error *894 in the trial court's denial of penalties and attorney's fees.
For the above and foregoing reasons, the judgment of the trial court is affirmed. Appellants are cast with all costs of this appeal.
AFFIRMED.
NOTES
[1] Dr. Weiss also referred to this procedure in his deposition of March 27, 1986, as a chemonucleolysis.
[2] Plaintiff questions the timeliness of most of these payments, as the November and December payments were not received until January, 1986, and the following three checks were not received until the day before trial, April 7, 1986.
[3] The trial judge, in his written reasons for judgment, explained his calculation of the supplemental earnings benefits to which plaintiff was decreed entitled as follows:

"Plaintiff was earning $8.92 per hour at the time of his injury which computes to an average monthly wage of $1,434.24 [sic]. ($8.92 × 40 - $356.80 per week × 4.3 = $1,534.24) The average monthly wage based upon Federal minimum wage is $576.20 ($3.35 X 40 = $134.00 × 4.3 = $576.20) Ninety percent of $1,534.20 is $1,380.78. The difference between $1,380.78 and $576.20 is $804.58. Seventyfour percent of $804.58 is $595.38."
The parties do not question this calculation except defendants assert that there was employment available to plaintiff from which he would have earned in excess of the federal minimum wage, an issue which we will discuss hereafter.
[4] La. R.S. 23:1221(3) has since been amended by Acts 1985, No. 926, § 1, effective January 1, 1986.